## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## COLUMBIA DIVISION

| | | |
|---|---|---|
| Kareem D. Coleman, | ) | C/A: 1:21-cv-01043-CMC-SVH |
| | ) | |
| Plaintiff, | ) | COMPLAINT |
| | ) | (42 U.S.C. § 1983) |
| v. | ) | (Jury Trial Demanded) |
| | ) | |
| Bryan P. Stirling, Michael McCall, Dennis | ) | |
| Patterson, Colie L. Rushton, Joseph Stines, | ) | |
| Joel Anderson, Aaron Joyner, Edward | ) | |
| Tisdale, Jr., Kenneth Sharp, Sam Ray, | ) | |
| Annie McCullough, Arenda Thomas, | ) | |
| Cynthia Petty, Michael Beedy, Raymond | ) | |
| Johnson, Venyke Smith, Marilyn Williams, | ) | |
| Elsie Pressley, Niccole Sheppard, Jacobia | ) | |
| Richardson, Romona Poston, Sequawna | ) | |
| Rogers, Colonda Robinson, Emily | ) | |
| Anderson, Lucretia Mack, Jamel Yates, | ) | |
| Marquita McCullough, Jamal Clavon, | ) | |
| Edwin Settles and Linda Haynesworth, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff named herein, complaining of Defendants herein, would respectfully show unto this Honorable Court and allege as follows:

### JURISDICTION

1.    This action is an action for money damages brought pursuant to 42 U.S.C.A. §§ 1983, et seq., and the Fourth, Eighth and Fourteenth Amendments to the United States Constitution, and under the common law, the statutory law, and the Constitution of the State of South Carolina, against Defendants.

2.    Subject matter jurisdiction is conferred upon the Court by 28 U.S.C.A. §§ 1331, 1367 (a), (b), (c), (d), and 1343, and 28 U.S.C.A. §§ 2201 and 2202.

## PARTIES

3.      The Plaintiff, Kareem D. Coleman, is a citizen and resident of the State of South Carolina.

4.      At all times mentioned in the Complaint, the Defendant Bryan P. Stirling was the Director of the SCDC. At all relevant times hereinafter mentioned Director Stirling was acting individually as an employee and/or administrator of the South Carolina Department of Corrections – to include Lee Correctional Institution. Additionally, Director Stirling was in charge of the specific operations for all SCDC facilities, including Lee CI. For purposes of claims asserted under 42 U.S.C. § 1983, Director Stirling is being sued in his individual capacity, under the color of state law. Upon information and belief, Director Stirling had direct knowledge of the unsafe conditions present during the time period in question, had direct knowledge of the substantial risk of serious harm to the Plaintiff, and supervised other Defendants who had direct contact with the Plaintiff or had knowledge of the above.

During the time period in question, the Plaintiff's Constitutional rights were well established and well known to Director Stirling, including and not limited to, the Plaintiff's right to due process, right to be free from danger and right to be free from cruel and unusual punishment. Additionally, Director Stirling had actual and/or constructive knowledge that his subordinates were engaged in conduct that posed a pervasive and unreasonable risk of Constitutional injury to the Plaintiff. Further, the response of Director Stirling to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the offenses by him as alleged herein; and there was a causal link between his actions and/or inactions and the Constitutional injury suffered by the Plaintiff.

5.     Upon information and belief (during the time period set out below) Defendant Michael McCall was the Deputy Director of Operations of the South Carolina Department of Corrections. At all relevant times hereinafter, mentioned Mr. McCall was acting individually as an employee and/or administrator of the South Carolina Department of Corrections – to include Lee Correctional Institution. For purposes of claims asserted under 42 U.S.C. § 1983, Mr. McCall is being sued in his individual capacity, under the color of state law. Upon information and belief, Mr. McCall had direct knowledge of the unsafe conditions present during the time period in question, had direct knowledge of the substantial risk of serious harm to the Plaintiff, and supervised others who had direct contact with the Plaintiff or had knowledge of the above.

During the time period in question, the Plaintiff's Constitutional rights were well established and well known to Mr. McCall, including and not limited to, the Plaintiff's right to due process, right to be free from danger and right to be free from cruel and unusual punishment. Additionally, Mr. McCall had actual and/or constructive knowledge that his subordinates were engaged in conduct that posed a pervasive and unreasonable risk of Constitutional injury to the Plaintiff.  Further, the response of Mr. McCall to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the offenses by him as alleged herein; and there was a causal link between his actions and/or inactions and the Constitutional injury suffered by the Plaintiff.

6.     Upon information and belief (during the time period set out below) Defendant Dennis Patterson was the Assistant Deputy Director of Operations of the South Carolina Department of Corrections. At all relevant times hereinafter, mentioned Mr. Patterson was acting individually as an employee and/or administrator of the South Carolina Department of Corrections – to include Lee Correctional Institution. For purposes of claims asserted under 42

U.S.C. § 1983, Mr. Patterson is being sued in his individual capacity, under the color of state law. Upon information and belief, Mr. Patterson had direct knowledge of the unsafe conditions present during the time period in question, had direct knowledge of the substantial risk of serious harm to the Plaintiff, and supervised others who had direct contact with the Plaintiff or had knowledge of the above.

During the time period in question, the Plaintiff's Constitutional rights were well established and well known to Mr. Patterson, including and not limited to, the Plaintiff's right to due process, right to be free from danger and right to be free from cruel and unusual punishment. Additionally, Mr. Patterson had actual and/or constructive knowledge that his subordinates were engaged in conduct that posed a pervasive and unreasonable risk of Constitutional injury to the Plaintiff. Further, the response of Mr. Patterson to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the offenses by him as alleged herein; and there was a causal link between his actions and/or inactions and the Constitutional injury suffered by the Plaintiff.

7.       Upon information and belief (during the time period set out below) Defendant Colie L. Rushton was the Director of the Division of Security of the South Carolina Department of Corrections. At all relevant times hereinafter, mentioned Mr. Rushton was acting individually as an employee and/or administrator of the South Carolina Department of Corrections – to include Lee Correctional Institution. For purposes of claims asserted under 42 U.S.C. § 1983, Mr. Rushton is being sued in his individual capacity, under the color of state law. Upon information and belief, Mr. Rushton had direct knowledge of the unsafe conditions present during the time period in question, had direct knowledge of the substantial risk of serious harm

to the Plaintiff, and supervised others who had direct contact with the Plaintiff or had knowledge of the above.

During the time period in question, the Plaintiff's Constitutional rights were well established and well known to Mr. Rushton, including and not limited to, the Plaintiff's right to due process, right to be free from danger and right to be free from cruel and unusual punishment. Additionally, Mr. Rushton had actual and/or constructive knowledge that his subordinates were engaged in conduct that posed a pervasive and unreasonable risk of Constitutional injury to the Plaintiff. Further, the response of Mr. Rushton to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the offenses by him as alleged herein; and there was a causal link between his actions and/or inactions and the Constitutional injury suffered by the Plaintiff.

8.     Upon information and belief (during the time period set out below) Defendant Joseph Stines was the Director of Special Projects – Operations of the South Carolina Department of Corrections. At all relevant times hereinafter, mentioned Mr. Stines was acting individually as an employee and/or administrator of the South Carolina Department of Corrections – to include Lee Correctional Institution. For purposes of claims asserted under 42 U.S.C. § 1983, Mr. Stines is being sued in his individual capacity, under the color of state law. Upon information and belief, Mr. Stines had direct knowledge of the unsafe conditions present during the time period in question, had direct knowledge of the substantial risk of serious harm to the Plaintiff, and supervised others who had direct contact with the Plaintiff or had knowledge of the above.

During the time period in question, the Plaintiff's Constitutional rights were well established and well known to Mr. Stines, including and not limited to, the Plaintiff's right to

due process, right to be free from danger and right to be free from cruel and unusual punishment. Additionally, Mr. Stines had actual and/or constructive knowledge that his subordinates were engaged in conduct that posed a pervasive and unreasonable risk of Constitutional injury to the Plaintiff. Further, the response of Mr. Stines to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the offenses by him as alleged herein; and there was a causal link between his actions and/or inactions and the Constitutional injury suffered by the Plaintiff.

9.    Upon information and belief (during the time period set out below) Defendant Joel Anderson was the Director of the Division of External Security of the South Carolina Department of Corrections. At all relevant times hereinafter, mentioned Mr. Anderson was acting individually as an employee and/or administrator of the South Carolina Department of Corrections – to include Lee Correctional Institution. For purposes of claims asserted under 42 U.S.C. § 1983, Mr. Anderson is being sued in his individual capacity, under the color of state law. Upon information and belief, Mr. Anderson had direct knowledge of the unsafe conditions present during the time period in question, had direct knowledge of the substantial risk of serious harm to the Plaintiff, and supervised others who had direct contact with the Plaintiff or had knowledge of the above.

During the time period in question, the Plaintiff's Constitutional rights were well established and well known to Mr. Anderson, including and not limited to, the Plaintiff's right to due process, right to be free from danger and right to be free from cruel and unusual punishment. Additionally, Mr. Anderson had actual and/or constructive knowledge that his subordinates were engaged in conduct that posed a pervasive and unreasonable risk of Constitutional injury to the Plaintiff. Further, the response of Mr. Anderson to that knowledge was so inadequate as to show

deliberate indifference to or tacit authorization of the offenses by him as alleged herein; and there was a causal link between his actions and/or inactions and the Constitutional injury suffered by the Plaintiff.

10.     At all times mentioned in the Complaint, the Defendants Aaron Joyner (Warden), Edward Tisdale, Jr. (Associate Warden), Kenneth Sharp (Associate Warden), Sam Ray (Major), Annie McCullough (Captain), Arenda Thomas (Captain), Cynthia Petty (Lieutenant), Michael Beedy (Lieutenant), Raymond Johnson (Lieutenant), Venyke Smith (Lieutenant - Contraband), Marilyn Williams (Sergeant), Elsie Pressely (Sergeant), Niccole Sheppard (Sergeant), Jacobia Richardson (Sergeant – Contraband), Romona Poston (Sergeant) and Sequawna Rogers (Sergeant) were supervisors, administrators, and/or employees of SCDC who supervised other employees at the Lee Correctional Institution. At all relevant times hereinafter mentioned, these Defendants were acting individually as employees and/or administrators of the South Carolina Department of Corrections ("SCDC"). For purposes of claims asserted under 42 U.S.C. § 1983, these Defendants are being sued in their individual capacity, under the color of state law. Upon information and belief, these Defendants had direct contact with the Plaintiff, had direct knowledge of the unsafe conditions present during the time period in question, had direct knowledge of the substantial risk of serious harm to the Plaintiff, or supervised other Defendants who had direct knowledge of the above.

During the time period in question, the Plaintiff's Constitutional rights were well established and well known to each of the Defendants listed above, including and not limited to, the Plaintiff's right to due process and his right to be free from cruel and unusual punishment. Additionally, these Defendants had actual and/or constructive knowledge that they and their subordinates were engaged in conduct that posed a pervasive and unreasonable risk of

Constitutional injury to the Plaintiff. Further, the response of these Defendants to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the offenses by them as alleged herein; and there was a causal link between their actions and/or inactions and the Constitutional injury suffered by the Plaintiff.

11.     Upon information and belief (during the time periods set out below), Defendants Colonda Robinson, Emily Anderson, Linda Haynesworth, Lucretia Mack, Jamel Yates, Marquita McCullough, Jamal Clavon, and Edwin Settles were correctional officers who had direct contact with the Plaintiff and/or had direct knowledge of the substantial risk to the Plaintiff's safety and health. These Defendants had the obligation and opportunity to protect the Plaintiff from physical harm. Additionally, during the time period in question, the Plaintiff's constitutional rights were well established and well known to the Defendants listed above. This would include, and not be limited to, the Plaintiff's right to due process and his right to be free from cruel and unusual punishment. These Defendants were consciously and deliberately indifferent to the safety of the Plaintiff by knowingly exposing the Plaintiff to a substantial risk to his physical safety. A more detailed description of their contact with the Plaintiff and knowledge of the substantial risks are set out below.

12.     The allegations set forth in this Complaint occurred in Lee County; therefore, venue is proper in this District.

## FACTS

13.     Prison officials have a federal constitutional duty (under the 8th Amendment) to protect inmates from violence at the hands of other prisoners. In this case the Plaintiff is informed and believes that (a) all Defendants/prison officials knew that the Plaintiff was exposed to a substantial risk of serious harm to his physical safety; (b) the Defendants consciously failed

to take reasonable measures to abate the risk; and (c) the Plaintiff suffered serious injuries as a direct result thereof.

14.     Lee Correctional Institution ("Lee CI") is a 1748-bed, level III, maximum security, male prison that opened in 1993. Lee CI is a campus style institution compromising of seven (7) inmate housing units. The institution is divided into an East Yard (F2, F4, F6) and a West Yard (F1, F3, F5). At the front of the institution are the administrative offices, medical services, inmate visitation and admission/discharge areas. The Restricted Housing units are located on the West Yard of the administrative building. At the rear of the institution are two (2) industry program units, maintenance sheds, kitchen, dining hall and commissary. The perimeter is comprised of a continuous double chain link fence with multiple rolls of razor wire and alarm systems.

15.     Five (5) of the housing units are of the same design (F1, F2, F3, F4, F6) that each contain 128 two-man cells, divided equally into an A and B side with a maximum capacity in each unit of 256 inmates. Between the two (2) sides (wings) is a sally port with staff offices and small programs rooms located therein. All doors to the units and wings (including cell doors) require staff to manually open them with a key. During the time period in question, these housing units did not have a "gang release system" that allowed correctional staff to open or close all cells at one time in the event the units needed to be quickly evacuated. The operations staff (to include Defendants Stirling, McCall, Patterson, Rushton, Stines and Anderson) were all aware that it was fundamentally unsafe to operate a level III facility without a "gang release system." The conscious failure to have a "gang release system" in place contributed to the incidents that occurred on April 15, 2018.

16.     On the West Yard, the F5 unit had a different design from the other housing units.

F5 consisted of four (4) pods of 32 two-man cells; each with a maximum capacity of 256 inmates. The F5 unit was designed to provide greater control with a centrally located secure control room having visibility to all four (4) pods. All doors were pneumatically controlled from the secure control room. However, during the time period in question, all of the cell doors within the F5 unit were easily compromised. Inmates could easily disable the locking mechanism so that the cell doors could be opened at any time – even though the control panel (in the control room) would indicate that the cells were locked. Also, just prior to the time period in question, the main door to enter into the F5 unit did not lock. These problems were well known to all Defendants and had been present since at least 2015. However, prior to this incident, the operations staff and the warden (to include Defendants Stirling, McCall, Patterson, Rushton, Stines, Anderson and Joyner) made absolutely no effort to ensure that the cell doors in F5 worked properly. This created a fundamentally unsafe condition for all inmates located in the F5 unit.

17.    An additional design flaw to the housing units located at Lee CI during the time period in question was that they did not have readily accessible ports to disburse chemical agents into the housing units (including F1, F3 & F5). This is utilized in the event of an emergency situation such as an assault and/or insurrection. Prior to the events in question, the operations staff (to include Defendants Stirling, McCall, Patterson, Rushton, Stines and Anderson) knew about this problem and did nothing to ensure that there were readily accessible chemical agent ports in these units. This also helped to create a fundamentally unsafe situation in all units to include F1, F3 and F5. Additionally, had the officers been able to utilize appropriate chemical agent on April 15, 2018, it would likely have prevented numerous injuries to the inmates, including the Plaintiff.

18.     The Plaintiff is informed and believes that prior to the incidents in question, the employees of SCDC and staff at Lee Correctional Institution (to include and not be limited to Bryan P. Stirling, Michael McCall, Dennis Patterson, Colie L. Rushton, Joseph Stines, Joel Anderson, Aaron Joyner, Edward Tisdale, Jr., Kenneth Sharp, Sam Ray, Annie McCullough, Arenda Thomas, Cynthia Petty, Michael Beedy, Raymond Johnson, Venyke Smith, Marilyn Williams, Elsie Pressley, Niccole Sheppard, Jacobia Richardson, Romona Poston, Sequawna Rogers, Colonda Robinson, Emily Anderson, Lucretia Mack, Jamel Yates, Marquita McCullough, Jamal Clavon, Edwin Settles, Linda Haynesworth) had entered into a conscious pattern and practice of failing to provide the adequate and/or specific number of properly trained officers at numerous locations throughout the Lee Correctional facility.  Further, these Defendants knew or should have known that their conscious failure to provide adequate security measures would result in unsafe conditions for the inmate population – to include and not be limited to unlimited exposure to illegal contraband (including weapons) and failing to recognize when an inmate (such as the Plaintiff) required emergent medical care due to severe injury.

19.     In 2015 Lee Correctional Institution had a volatile history and was characterized as the state's most dangerous facility. Since 2010, inmates had taken over portions of Lee Correctional Institution twice, the facility was the scene of at least three (3) hostage situations and had at least four (4) significant disturbances. In 2015, LCI had approximately 63 security staff vacancies. These staffing issues/shortages led to many problems; to include frequent lockdowns of the housing units which increased tension among the inmate population causing the heightened potential for violence. Also, in 2015 regular and routine searches were not being conducted by staff. This left the facility open/vulnerable to inmates having various types of contraband; including shanks, knives, and illegal drugs. This also created dangerous conditions

for the inmate population. Additionally, in 2015 the video camera system was deficient and all cells located in the F5 unit were malfunctioning and could not be safely locked. Additionally, because of understaffing, only one (1) officer was working the housing units in conscious violation of SCDC policies and procedures. These facts were well known to the administrative and operations staff – to include Defendants Stirling, McCall, Patterson, Rushton, Stines, Anderson and Joyner.

20.    During the time period in question, Lee Correctional Institution was classified as a level three (3) correctional institution denoting that it is a maximum-security facility housing the most dangerous inmates. Additionally, prior to the events involved in this incident, this facility had a long history of overcrowding and failure to provide adequate security and supervision over the inmate population located at the facility. This was well known to all named Defendants.  Specifically, just prior to and during the time period in question, the Defendants consciously failed to provide the adequate and/or proper numbers of adequately trained security personnel at numerous locations throughout the Lee Correctional facility. Plaintiff is informed and believes that Lee CI had an authorized strength requirement – number of security positions identified to operate the facility safely – of 290 security staff level employees based on assessment and reporting commissioned by the South Carolina Department of Corrections. In 2017, Lee CI only had 169 of these positions filled. Further, upon information and belief, just prior to the time in question (specifically from July 2017 through February 2018), Lee Correctional had an 86% vacancy in front-line positions, which included positions with the most frequent direct contact with inmates such as post assignments in housing units, transportation, yard, inmate escorts, and direct security within a specific area. Prior to the incident in question, all of the Defendants were aware of this deficit and knew that their conscious failure to provide

proper staffing and adequate security measures would result in unsafe conditions for the inmate

population – to include the type of event which occurred on April 15, 2018 involving the

Plaintiff.

21.     With a severely limited number of correctional staff available for duty, sound

correctional operations were jeopardized and routinely compromised. The correctional staff

working at Lee CI just prior to the incident in question was unable to carry out basic correctional

functions due to the critical staffing shortages. These shortages resulted in correctional staff

being mandated to work overtime, often with a single officer assigned to handle 256 inmates in

an entire housing unit. This was exacerbated by the fact that the majority of the officers working

in these units were extremely inexperienced. These issues were well known to the operations

staff (to include Defendants Stirling, McCall, Patterson, Rushton, Stines, Anderson and Joyner).

However, prior to the events in question, these Defendants made no attempt to correct the

staffing shortage problem.

22.     Prior to the incidents in question, contraband was a major issue at Lee CI. Cell

phones, drugs, and weapons were readily available to all inmates in all of the housing units.

Disputes over the control of contraband was a contributing factor to the April 15, 2018 incident.

A large percentage of the inmate population carried or had ready access to weapons (such as

knives and shanks) to inflict physical harm. Prior to April 15, 2018, Lee CI had not taken any

steps to conduct regular searches of the housing units. During this time period, search plans were

not established and the housing officers were not conducting cell searches and inmates were not

randomly searched during movement times. This was all in conscious violation of SCDC

policies and procedures. The Defendants knew or should have known that their conscious failure

to take some action to keep out and/or remove the contraband would result in unsafe conditions for the inmate population – to include the type of incidents which occurred.

23.     Prior to the April 15, 2018 incident, roll calls and formal counts were not being properly performed and/or conducted by the correctional staff in the housing units (to include F1, F3, F5) to ensure that all inmates were accounted for and that they were in the proper cells. All Defendants knew that these were not being done and if they were not done, it would likely result in unsafe conditions for the inmate population. This was also a conscious violation of SCDC policy and procedure. Additionally, in the months leading up to the April 15, 2018 incidents, inmates were improperly allowed to move freely between the different housing units and wings within the individual housing units. In fact, on some occasions inmates would spend the night in a different housing unit than what they were assigned to. All of the Defendants were aware that this was occurring and that it was dangerous and created unsafe conditions in F1, F3 and F5.

24.     In October of 2017, Defendants McCall, Patterson, Rushton, Stines, Anderson and Stirling (the "Operations Staff") made the executive decision to order the F3 Unit of Lee CI West Yard (that was being utilized as an Addiction Treatment Unit [ATU] housing approximately 6070 inmates) be vacated in order to make room for a large group of inmates from McCormick Correctional Institution. The F3 unit was made up of an A and B wing and could house a total of approximately 256 inmates. These inmates were to be transferred in large groups directly from McCormick CI to Lee CI. However, in actuality, the group earmarked for transfer to Lee CI numbered over 300 inmates from McCormick and Broad River Correctional Institutions. These inmates consisted of high-ranking gang members and were considered to be the "worst of the worst" in terms of disciplinary problems and violent behavior.  All Defendants

(including the operations staff) were well aware that they were transferring these type inmates to a facility which was already in disarray. They were also well aware of the fact that taking this action would place all of the inmates (especially those in F1, F3, and F5) in danger.

25.    The majority of the inmates which were eventually transferred to Lee CI from McCormick Correctional Institution were previously involved in a violent insurrection which occurred at McCormick CI on or about September 22, 2017. As a result of this insurrection, many inmates were assaulted, stabbed and severely injured. The operations staff (to include Defendants Stirling, McCall, Patterson, Rushton, Stines and Anderson) were aware of this insurrection but still made the decision to move all of these inmates to the most dangerous and unsafe correctional institution in the State. At this time Lee CI was obviously ill-equipped to handle the threat level these new inmates were going to create. As a result, Aaron Joyner (Warden of Lee CI) sent numerous emails to administrative/operations personnel (including Defendant McCall, Patterson, Rushton, Stines and Anderson) in October of 2017 concerning the list of inmates that were to be transferred to Lee CI. Warden Joyner directly informed Defendants McCall, Sterling, Patterson, Rushton, Stines and Anderson that he was familiar with many of the inmates to be transferred to Lee and that they were the most violent throughout the prison system. He further informed these Defendants that many of these inmates were gang members, had assaulted staff and had caused and/or participated in multiple disturbances. He further informed these Defendants that his facility could not handle these inmates and asked specifically that they not be transferred to Lee CI. Despite these pleas for help, approximately 300 inmates were transferred into F3 and F1 units of Lee CI between October 31, 2017 and December 7, 2017. Shortly thereafter, Warden Joyner continued to contact Defendants Stirling, Patterson, Rushton, McCall, Anderson and Stines, begging them to remove a short list of inmates

from the 300 that had been transferred. This list contained what Warden Joyner believed to be the absolute worst of the worst disciplinary problems. These requests were also ignored by McCall, Patterson, Rushton, Stines and Stirling. Had the operations staff heeded these warnings and taken action to direct these inmates to other facilities, then the events which occurred on April 15, 2018 could have been avoided.

26.    Plaintiff is informed and believes that according to SCDC policy, prior to transferring any inmate from one institution to another, SCDC Central Classification is required to pull that inmate's record to make sure there are no precautions against placing these inmates with other inmates and/or staff at the receiving institution ("precautions" meaning, there were no red flags in their individual files stating that they could not be housed at the same institution as other certain inmates/staff). They are also required to check the STG (gang) status of the inmate being transferred to see if it was safe to transfer him into that specific institution or unit. The operations staff (including McCall, Stirling, Stines, Patterson, Rushton and Anderson) were required to make sure that these actions are being taken. However, these policies were consciously not adhered to and followed prior to the transfer of these 300 inmates to Lee CI. These inmates were transferred based on Defendant McCall's order and no precautions were taken. This was all carried out with the knowledge and consent of the "operations staff" – consisting of Defendants Stirling, McCall, Patterson, Rushton, Stines and Anderson.

27.    The transfer of these inmates immediately changed the atmosphere at Lee CI in dramatic and persistent ways. These inmates were predominantly STG (gang) members and with a history of creating safety problems at institutions where they were housed. Lee CI absorbed these inmates into its facility without adequate information regarding their gang status or disciplinary history. Just prior to the April 15, 2018 events, the climate at Lee CI was one of

extreme stress and concern for the individual safety of the correctional staff and inmates. This was greatly exacerbated by the overall lack of staff and the fact that the majority of inmates were consistently armed with weapons. Prior to the events in question, the operations staff (to include Defendants Stirling, McCall, Patterson, Rushton, Stines and Anderson) were clearly aware of the above and consciously took no action whatsoever to improve and alleviate the unsafe, dangerous conditions that existed 24hrs a day.

28.    In the months leading up to April 15, 2018, the operations staff (to include Defendants Stirling, McCall, Patterson, Rushton, Stines and Anderson) provided inadequate communication and support for Lee CI in general and specifically as it related to the influx of the inmates between October and December of 2017. The lack of communication, structural support and oversight from the operations staff (to include Defendants Stirling, McCall, Patterson, Rushton, Stines and Anderson) resulted directly in the failure to address significant trends and events occurring at Lee CI between October 2017 and April 15, 2018.

29.    Once completion of the transfer of inmates occurred (December 2017), Lee CI saw
an immediate significant rise in the number of assaults taking place within the facility. Specifically, there is documentation of multiple inmate-on-inmate assaults in October 2017; one (1) inmate-on-inmate assault in November 2017 resulting in death; one (1) inmate-on-inmate assault in December 2017; multiple inmate-on-inmate assaults in February 2018 – at least one (1) resulting in death; multiple inmate-on-inmate assaults in March 2018. On March 23, 2018 SCDC log books indicate that multiple inmates were fighting in front of the F3 and F1 units. These were significant indicators of the deficiency of security personnel and failure to follow proper policies and procedures. These were also significant indications of just how unsafe Lee

CI had become since the transfer of these 300 inmates into the Lee CI facility. All Defendants should have been on heightened alert and made sure to follow SCDC protocols in order to ensure the safety of the Lee CI staff as well as the inmates housed at the facility. However, armed with this knowledge, the Defendants (including Stirling, McCall, Patterson, Rushton, Stines, Anderson and Joyner) consciously failed to take any steps to ensure the safety of the inmate population at Lee CI – to include the Plaintiff.

30.     Based on the above, during this time period, Lee CI was clearly the most dangerous and unsafe correctional institution in the State. The facility was severely understaffed and basically being run by various gangs – most of which had access to all forms of illegal contraband including cell phones, drugs and weapons (including knives/shanks). At this time, the inmate population (to include the Plaintiff) basically had no way to protect themselves from the dangerous conditions which existed 24hrs a day.

32.     Prior to the events in question, each of the individual Defendants (to include and not be limited to Bryan P. Stirling, Michael McCall, Dennis Patterson, Colie L. Rushton, Joseph Stines, Joel Anderson, Aaron Joyner, Edward Tisdale, Jr., Kenneth Sharp, Sam Ray, Annie McCullough, Arenda Thomas, Cynthia Petty, Michael Beedy, Raymond Johnson, Venyke Smith, Marilyn Williams, Elsie Pressley, Niccole Sheppard, Jacobia Richardson, Romona Poston, Sequawna Rogers, Colonda Robinson, Emily Anderson, Lucretia Mack, Jamel Yates, Marquita McCullough, Jamal Clavon, Edwin Settles, Linda Haynesworth) had received training on recognizing any and all potential safety and security issues. Additionally, these Defendants had received training that required them to ensure that safety and security initiatives were met ensuring the inmates were not placed at risk of serious injuries or death. In this case, the Defendants consciously failed to take the actions they were trained to provide. Further, even

without training, the individual Defendants involved in this case (to include and not be limited to Bryan P. Stirling, Michael McCall, Dennis Patterson, Colie L. Rushton, Joseph Stines, Joel Anderson, Aaron Joyner, Edward Tisdale, Jr., Kenneth Sharp, Sam Ray, Annie McCullough, Arenda Thomas, Cynthia Petty, Michael Beedy, Raymond Johnson, Venyke Smith, Marilyn Williams, Elsie Pressley, Niccole Sheppard, Jacobia Richardson, Romona Poston, Sequawna Rogers, Colonda Robinson, Emily Anderson, Lucretia Mack, Jamel Yates, Marquita McCullough, Jamal Clavon, Edwin Settles, Linda Haynesworth) should have easily been able to recognize that extended staff responsibility for more than one post and lack of supervision for routine operations due to lack of front-line employees would likely place the inmates in severe risk of serious harm and/or death.

33.     Prior to and during the time period in question, SCDC policy and procedure required direct supervision of all inmates located within the Lee Correctional Institution, and specifically, the F5 Unit.  This required there to be at least one (1) correctional officer to be present in each wing of each unit 24hrs a day. Prior to and during the time period in question there was normally only one (1) correctional officer working all four (4) pods of the F5 housing unit. The failure to ensure that this basic SCDC minimum standard was followed was an example of the operations staff's conscious failure to ensure the safety of the inmates located at Lee CI during the time period – to include the Plaintiff.

34.     During the time period in question SCDC policy and procedure required that the correctional officers working the housing units (such as the F5 Unit) be properly trained to recognize any and all potential security issues. However, 55% of the correctional officers/frontline security staff had only been at the facility for less than one (1) year – some with only weeks of experience and who were being assigned to work entire units alone.

Therefore, not only were the operations staff aware that Lee CI was severely understaffed, they were also aware that they were inexperienced. This clearly placed the inmate population at increased risk of harm.

35.     Upon information and belief, SCDC Operations staff (to include Defendants Stirling, McCall, Patterson, Rushton, Stines and Anderson) and Lee Correctional Institution management personnel (to include Defendants Joyner, Tisdale, Sharp, Ray, McCullough and Thomas) consciously deviated from numerous security initiatives, which led to a further unsafe and unsecure environment, placing inmates at risk of serious and/or deadly injuries. These deviations included, but were not limited to extended staff responsibility for more than one post and lack of supervision for routine operations due to lack of front-line employees. These conscious deviations ultimately prevented all Defendants from being able to properly intervene and prevent or stop the attacks which occurred on April 15, 2018.

36.     To further exacerbate the ongoing security staffing issues, the dilapidated and deteriorating condition of the F5 Unit was not appropriate to house level 3 inmates. For at least five (5) years prior to April of 2018 this Unit had been housing inmates with cells doors that did not lock or could easily be disabled – allowing inmates to roam around at will. This also provided no protection for the inmates housed in that unit. F5 had no readily accessible ports to disperse chemical agent into the housing unit should the inmates overwhelm the typically one (1) security officer assigned to maintain safety/security. These conditions were well known and consciously ignored by all of the individual Defendants for years prior to the incidents in question.

37.     On April 11, 2018, the administrative correctional staff at Lee CI (to include Defendants Joyner, Tisdale, Sharp, Ray, McCullough and Thomas) observed and/or became

aware that between 200 and 300 inmates were on the F1 B-wing and that the majority of these inmates were housed in different units other than F1. This was consciously allowed to occur without consequence or taking any disciplinary action. These types of occurrences became more and more typical and frequent in the days leading up to April 15, 2018. These actions were conscious violations of SCDC policy and procedure.

38.    On or about the 13th day of April, 2018, inmates on the West Yard and specifically in F3 were seen and heard sharpening shanks/knives. The Plaintiff is informed and believes that Defendants Williams, Sheppard, Yates, Ray, Tisdale, Joyner, Smith, McCall were aware that this occurred on this date and consciously failed to take any action to confiscate this contraband and discipline those inmates who were taking this action. Had actions been taken at this time, the events which occurred on April 15, 2018 could have been avoided.

39.    The Plaintiff is informed and believes that on or about the evening of April 14, 2018 the Defendants (to include and not be limited to Pressley, Johnson) became aware that there was unrest among the inmates housed within the F3 Unit. Specifically, it was reported that several of the inmates within the F3 Unit had sabotaged their electrical outlets which made the lights go off within their cells and other inmates would not allow correctional staff to lock/secure their cell doors. Instead of addressing the issues, correctional staff working the F3 unit were told to abandon their post by Defendants Johnson, McCullough, Ray, Sharp, Tisdale and Joyner, leaving the unit unsupervised and doors unlocked. This created an extremely dangerous situation.

40.    The Plaintiff is informed and believes that during the hours prior to the incidents in question on April 15, 2018, Defendant Sgt. Poston was working the West Yard. During this time, she witnessed inmates freely roaming around from pod to pod in housing unit F5.

Thereafter, she entered F3, where she began to let certain inmates out to go to visitation. During this time, and in her presence, multiple inmates pushed their way out of the F3 unit and entered other housing units (F1, F5). However, nothing was done by Sgt. Poston to prevent this from happening or to alert her supervisors that these events were occurring. Defendant Poston then proceeded to F1 to let out the diabetic inmates; however, at this time approximately ten (10) non-diabetic inmates pushed their way out of the F1 unit. In her statement to Police Services, Defendant Poston stated that she did call first responders to F1; however, no one came. No other actions were taken by Defendant Poston to prevent events from spreading out of control.

41.     The Plaintiff is informed and believes that in a correctional setting it is better to stop a problem before it becomes a crisis and/or a full-blown major incident.

42.     On April 15, 2018, the Plaintiff is informed and believes that due to the shift change and scheduled formal count, all inmates were supposed to be locked down within their cells at approximately 7:00pm (to be properly counted). This lockdown and count for F5 should have been performed by the outgoing shift officer to be taken over by the oncoming shift officer (Defendant E. Anderson). This never occurred – which was a violation of SCDC policy and procedure. Had the proper lockdown and formal count procedures been carried out, the violent events which followed would likely have not occurred. However, this type of improper count was a common occurrence in the months and weeks leading up to April 15, 2018 and was well known to all Defendants.

43.     The Plaintiff is informed and believes that at approximately 7:15pm, first responders were called to the F3 unit due to numerous violent assaults that were taking place among the inmate population of that unit.  At this time, the only staff in the F3 Unit were two (2) female correctional officers (one whose shift was ending and one who had just arrived). At no

time did anyone attempt to gain control of the Unit and/or de-escalate the situation. Once the female officers were "rescued," the outer doors to the F3 Unit were secured leaving the inmates unsupervised and creating a situation where none of the wounded could seek medical aid. At this time, the Plaintiff is informed and believes that correctional staff (to include and not be limited to Defendants Pressley and Petty) were ordered away from F3 by Defendant McCullough to go look for an unknown inmate that was thought to be on the yard. While these Defendants were wasting time digging through trash looking for an unknown inmate, the situation in F3 spread to the F1 Unit.

44.    The Plaintiff is informed and believes that because these violent assaults/incidents occurring in F1 and F3 between rival factions in the hours leading up to the incidents in question were left unchecked and uncontrolled, the major insurrection (which originated) in F3, eventually spilled over into the F1 and F5 units.

45.    The Plaintiff is informed and believes that while the situation in the F3 Unit continued to escalate, the 252 inmates in F5 were allowed to wander and loiter unchecked by Defendant Emily Anderson. In fact, the logbook documents that for approximately 90 minutes the inmates within F5 were walking around from pod to pod (with their heads covered up), standing around in groups and standing outside of the Unit. However, Defendant Emily Anderson did not call for first responders until approximately 9:00pm, when she documented inmates fighting in D-pod and that she could see a "lot of hatchets and knives." It is during this time that the Plaintiff was properly in A-Pod of the F5 Unit, where he was assigned, when a very large group of armed inmates rushed into the A-Pod threatening and then attacking the Plaintiff and other inmates.  With no way of locking his cell door and with Defendant Emily Anderson (taking no action to intervene or render aid to the inmates who were being attacked), the Plaintiff

and other inmates were forced to escape the A-Pod. The Plaintiff, as well as several other inmates, attempted to make their way from the F5 Unit, to go down the fenced sidewalk, and up to the gate leading to the recreation yard; however, prior to arriving at the gate, the posted correctional officer(Defendant Haynesworth) locked the gate and abandoned his post – trapping the Plaintiff and numerous other inmates from gaining access to the yard, fleeing the attack and obtaining medical attention. Instead, after the violence/attacks followed him out of the F5 Unit, the Plaintiff, along with several other inmates, were forced to scale the chain-link fence, crawling over concertina wire and jumping to the recreation yard, to avoid further attack.  The Plaintiff suffered a number of wounds as a result of the attacks and severe lacerations to his right arm/wrist in being forced to escape over the concertina wire. Once on the rec yard, the Plaintiff was forced to remain outside (in full view of correctional staff who could be seen looking outside from the safety of one of the buildings) bleeding and injured along with other inmates who had escaped Unit F-5. Because the correctional staff present (to include and not be limited to Defendants Annie McCullough, Arenda Thomas, Cynthia Petty, Michael Beedy, Raymond Johnson, Venyke Smith, Marilyn Williams, Elsie Pressley, Niccole Sheppard, Jacobia Richardson, Romona Poston, Sequawna Rogers, Colonda Robinson, Emily Anderson, Lucretia Mack, Jamel Yates, Marquita McCullough, Jamal Clavon, Edwin Settles, Linda Haynesworth) refused to take action to intervene and/or render aid, the Plaintiff had no protection or means to seek immediate medical care for his injuries. These Defendants consciously failed to take any action to protect the Plaintiff from this known threat of harm, either directly or indirectly, in violation of SCDC's policies and procedures and the Plaintiff's constitutional rights.

46.     After some time, the Plaintiff was finally carried to medical and treated for multiple wounds and lacerations. He also suffered from permanent scaring and impairments as a result of his injuries.

47.     During the April 15, 2018 incident, there was a significant delay in establishing a command post. A location was selected, but the Warden did not receive a proper briefing. A uniformed command was not established. At no time was it made clear that the Warden was in control and all decisions would require his approval. Therefore, the various incident sites within the institution were never isolated and controlled. This caused many inmates (including the Plaintiff) to be severely injured and not receive the medical attention they desperately needed. This was caused by Defendants Joyner, Tisdale, Sharp, Ray, McCullough, Thomas, Petty, Beedy, Johnson, Smith, Williams, Pressley, Sheppard, Richardson, Poston, Rogers, Robinson, Mack, Yates, M. McCullough, Clavon, Settles, Haynesworth, E. Anderson.

48.     Upon information and belief, the individual Defendants were well aware of the specific issues in this unit as, in the months prior to this incident, multiple similar incidents had taken place.  All Defendants were also equally aware of the existence of contraband within its facility, the understaffing issues, and the inability to keep inmates supervised as required.

49.     Prior to the incident in question, it was well known to all Defendants that a large percentage of its inmate population carried and/or had access to weapons, including shanks, to inflict physical harm. Further, these Defendants knew or should have known that their conscious failure to provide adequate monitoring and security measures would result in unsafe conditions for the inmate population – to include the type of incident which occurred on April 15, 2018 involving the Plaintiff.

50.     The Plaintiff is informed and believes that prior to the incident in question, the Defendants were well aware that prior investigations conducted by SCDC revealed repeated assaults and fights occurring within the Lee Correctional Institution making it one of the most dangerous of the SCDC facilities. The incident and investigative reports created by these events were well known to these Defendants – thus giving them ample knowledge of the dangerous risks of harm to inmates when they were left unsupervised, unmonitored and unprotected.

51.     Instead of ensuring that properly trained correctional officers were assigned and staffed to Lee Correctional Institution, including but not limited to Unit F5, the Defendants consciously and consistently allowed the substantial dangers to continue (as indicated above) – with no regard to the safety of the inmates (to include the Plaintiff). In fact, these Defendants consciously failed to take even the slightest measures to alleviate the risk of harm to the Plaintiff.

52.     After the events of April 15, 2018, a national entity was brought in by Defendant Stirling to perform a Post Incident Assessment. This team concluded that the major contributing factors leading to the insurrection were (as indicated above): critical staff shortages (with lack of experience), facility defects, atmosphere of fear and intimidation, major influx of violent inmates, and little to no communication and/or support from the operations staff.

53.     Based on the above, during this period of time, the Defendants failed to protect the Plaintiff from an obviously dangerous environment which was created by the lack of security personnel and safety measures.

54.     Additionally, the Defendants had a Federal Constitutional duty to protect inmates from violence at the hands of other persons when they knew or should have known that certain conditions presented a substantial safety risk. At all times relevant, the Defendants were not only on site at the facility, but they were well aware that the units in question were understaffed and

contained personnel who were not properly trained. They were also well aware that this created a highly dangerous situation for all inmates located in that area. Even though they had the opportunity and obligation, they consciously failed to take any steps to ensure the inmates' safety.

### FOR A FIRST CAUSE OF ACTION
### VIOLATION OF FEDERAL CIVIL RIGHTS 42 U.S.C. § 1983
### (4TH AND 8TH AMENDMENT – CRUEL AND UNUSUAL PUNISHMENT)

55.     Each and every allegation of fact contained in the Paragraphs above is re-alleged herein, as if re-stated verbatim.

56.     The Defendants were acting under the color or pretense of State law, customs, practices, usage, and/or policy at all times mentioned herein as correctional officers and/or supervisors who had certain duties imposed upon them with regard to the Plaintiff.  Additionally, during the time period in question, the Defendants were well aware of the Plaintiff's constitutional rights, including his right to be free from cruel and unusual punishment.

57.     The Defendants were consciously and deliberately indifferent to the Plaintiff and acted in egregious and arbitrary conduct during the time period mentioned in the facts in the following particulars:

(a)     in consciously and deliberately allowing gross overcrowding and understaffing at the Lee Correctional Institution;

(b)     in consciously and deliberately failing to provide the appropriate number of correctional staff at the various locations in Lee Correctional Institution (to include Unit F5);

(c)     in consciously and deliberately failing to provide adequate and appropriate security officers at the Lee Correctional Institution including the F5 Unit;

(d)     in consciously and deliberately failing to properly monitor the inmates (mainly the Plaintiff) at the Lee Correctional Institution including the F5 Unit;

(e)     in consciously and deliberately failing to protect the Plaintiff from an assault;

(f)     in consciously and deliberately failing to properly supervise the employees so as to ensure the safety of the inmates located at the Lee Correctional Institution;

(g)     in consciously and deliberately failing to protect the Plaintiff from serious harm;

(h)     in consciously and deliberately failing to adhere to the policies and procedures of SCDC;

(i)     in being consciously and deliberately indifferent to the Plaintiff's health and safety;

(j)     in consciously and deliberately failing to provide safe cells for the inmates to be housed in F5;

(k)     in consciously and deliberately failing to adhere to SCDC's minimum standards and post orders;

(l)     in consciously and deliberately failing to ensure that immediate medical care was provided to the Plaintiff when it was obvious he had serious injuries;

(m)     in consciously failing to meet the authorized strength requirement of front-line security staff and correctional facilities employees for Lee Correctional Institution;

(n)     consciously and deliberately violating Plaintiff's 8th and 14th Amendments to the United States Constitution; and

(o)     in any and all other conscious and deliberate acts as may be discovered throughout the pendency of this action.

58.     As a direct and proximate result of the Defendants' acts of conscious and deliberate indifference, jointly, severally, and in combination thereof, the Plaintiff suffered, and continues to suffer, deprivation of his rights secured by the Fourth and Eighth Amendment to the United States Constitution.

59.     As a result, the Plaintiff suffered, and continues to suffer, conscious pain, mental and physical suffering, indignity, and loss of his aforementioned federal rights. Further, the Plaintiff incurred medical expenses, permanent scarring, and permanent impairments as a direct result of the Defendants' actions. The Plaintiff will likely suffer from the effects of the

Defendants' actions now and in the future, and Plaintiff demands ACTUAL,

CONSEQUENTIAL, and

PUNITIVE DAMAGES from the Defendants.

**FOR A SECOND CAUSE OF ACTION**
**VIOLATION OF FEDERAL CIVIL RIGHTS 42 U.S.C. § 1983**
**(14TH AMENDMENT – DUE PROCESS VIOLATION)**

60.     Each and every allegation of fact contained in the Paragraphs above is re-alleged

herein, as if re-stated verbatim.

61.     The Defendants were acting under the color or pretense of State law, customs,

practices, usage, and/or policy at all times mentioned herein as correctional officers and/or

supervisors who had certain duties imposed upon them with regard to the Plaintiff.  Additionally,

during the time period in question, the Defendants were well aware of the Plaintiff's

constitutional rights, including his right to due process.

62.     The Defendants were consciously and deliberately indifferent to the Plaintiff and

acted in egregious and arbitrary conduct during the time period mentioned in the facts in the

following particulars:

(a)     in consciously and deliberately allowing gross overcrowding and understaffing at the Lee Correctional Institution;

(b)     in consciously and deliberately failing to provide the appropriate number of correctional staff at the various locations in Lee Correctional Institution (to include Unit F5);

(c)     in consciously and deliberately failing to provide adequate and appropriate security officers at the Lee Correctional Institution including the F5 Unit;

(d)     in consciously and deliberately failing to properly monitor the inmates (mainly the Plaintiff) at the Lee Correctional Institution including the F5 Unit;

(e)     in consciously and deliberately failing to protect the Plaintiff from an assault;

(f)    in consciously and deliberately failing to properly supervise the employees so as to ensure the safety of the inmates located at the Lee Correctional Institution;

(g)    in consciously and deliberately failing to protect the Plaintiff from serious harm;

(h)    in consciously and deliberately failing to adhere to the policies and procedures of SCDC;

(i)    in being consciously and deliberately indifferent to the Plaintiff's health and safety;

(j)    in consciously and deliberately failing to provide safe cells for the inmates to be housed in F5;

(k)    in consciously and deliberately failing to provide the Plaintiff due process prior to subjecting him to the punishment he endured;

(l)    in consciously and deliberately failing to adhere to SCDC's minimum standards and post orders;

(m)    in consciously and deliberately failing to ensure that immediate medical care was provided to the Plaintiff when it was obvious he had serious injuries;

(n)    in consciously failing to meet the authorized strength requirement of front-line security staff and correctional facilities employees for Lee Correctional Institution;

(o)    consciously and deliberately violating Plaintiff's 8th and 14th Amendments to the United States Constitution; and

(p)    in any and all other conscious and deliberate acts as may be discovered throughout the pendency of this action.

63.    As a direct and proximate result of the Defendants' acts of conscious and deliberate indifference, jointly, severally, and in combination thereof, the Plaintiff suffered, and continues to suffer, deprivation of his rights secured by the Fourteenth Amendment to the United States Constitution.

64.    As a result, the Plaintiff suffered, and continues to suffer, conscious pain, mental and physical suffering, indignity, and loss of his aforementioned federal rights. Further, the Plaintiff incurred medical expenses, permanent scarring, and permanent impairments as a direct

result of the Defendants' actions. The Plaintiff will likely suffer from the effects of the

Defendants' actions now and in the future, and Plaintiff demands ACTUAL,

CONSEQUENTIAL, and PUNITIVE DAMAGES from the Defendants.

WHEREFORE, the Plaintiff prays judgment against the Defendants, both jointly and

severely, for ACTUAL, CONSEQUENTIAL, AND PUNITIVE DAMAGES, to be determined

by a competent jury and for reasonable attorney's fees and the costs of this action.

Respectfully Submitted,

s/William J. Jones
William J. Jones, Esquire
U.S.D.C. Bar# 7360
Smith & Jones Law, LLC
949 East Main St., Suite B
Post Office Box 2145 (29071)
Lexington, SC 29072
(803) 996-3333 - Office
(803) 746-7780 - Facsimile
bjones@smithandjoneslaw.com
*Attorney for the Plaintiff*

April 8, 2021
Lexington, South Carolina